The CORPORATE PRINTING COMPA-
NY, INC., Petitioner-Appellee,

v.

NEW YORK TYPOGRAPHICAL UNION
NO. 6, INTERNATIONAL TYPO-
GRAPHICAL UNION, Respondent-Ap-
pellant.

No. 549, Docket 76–7482.

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1977.

Decided April 27, 1977.

John J. Sheehan, New York City, for respondent-appellant.

William G. O'Donnell, New York City, for petitioner-appellee.

Before FEINBERG, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

■ This case raises the question of whether a federal court may, at the behest of an employer, enjoin a union from organizing employees who are not protected by the Labor-Management Relations Act, 29 U.S.C. §§ 141 *et seq.* We hold that it may not.

On August 20, 1975, Corporate Printing Co., Inc. brought a Section 9(c) petition before the NLRB for a ruling that three customer service men were either "managerial employees" or "supervisors" not covered by the Labor-Management Relations Act. The National Labor Relations Board, Region 2 (by its Regional Director) ruled that the three employees were "managerial" employees not covered by the Labor-Management Relations Act. *N.L.R.B. v. Bell Aerospace Co., Div. of Textron, Inc.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The Board did not reach the employer's further contention that the customer service employees were "supervisors." The petition was dismissed for lack of jurisdiction.

The union nevertheless solicited and apparently obtained authorization cards from some customer service employees. The union did not seek certification from the NLRB, but it did request the New York State Mediation Board to certify the validity of the cards.

The theory of the union is that the employer consented in its collective bargaining agreement with Local 6 ("the Agreement") that if the union obtained such a card majority, it would recognize a unit of managerial employees with the union as its bargaining agent. It relies upon Section 111, set out in the margin.[1]

This threat of resort to the procedures under the contract led the employer to court action. It filed a petition in the District Court for a permanent injunction restraining the union from attempting to organize or represent its customer service employees.

On July 7, 1976, Judge Werker granted relief enjoining the union "from organizing

---

1. Section 111 of the labor agreement provides that:

 "In the event the Union should claim representation rights for units of employees not covered by this Contract and not represented by any other union, the parties agree that the Union may submit authorization cards signed by such employees to a third party, mutually agreed upon by the parties, for comparison with the Employer's payroll. If it is deter-

 mined that a majority of such employees have authorized the Union to represent them, the Employer shall recognize the Union as the bargaining agent for all employees in such classification. If the parties are unable to agree upon a third party to make signature comparison, the New York State Board of Mediation is authorized to make such comparisons and certification."

petitioner's managerial employees for the purpose of representing them as a part of the Union's bargaining unit" and restraining the union "from any activity with respect to those employees which compels the petitioner to recognize those employees as members or prospective members of the Union." [2] Judge Werker reasoned that the union's actions were "but one step toward including the managerial employees in its bargaining unit," that this inclusion is precluded by law except upon the consent of the employer, *Florida Power & Light Co. v. Local 641*, IBEW, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974), and that Section 111 of the Agreement did not constitute such consent.

We think that there is a fatal defect in the order: lack of jurisdiction. In deciding whether a District Court has jurisdiction to grant an injunction we must consider the scope of the Norris-La Guardia Act, enacted in 1932, rather than the scope of the Labor-Management Relations Act of 1947 which deals with the powers of the NLRB, defines "unfair labor practices" and regulates conditions for union elections. The Norris-La Guardia Act prevents interference with "persons organized to act in promotion of their interests in a labor dispute," while the LMRA provides *sanctions* against various unfair labor practices.

We hold that the Norris-La Guardia Act, 29 U.S.C. §§ 101–15 (1970), deprived the District Court of jurisdiction to issue the injunction.[3] Section 4 of that Act, 29 U.S.C. § 104, provides in part that

> "No court of the United States shall have jurisdiction to issue any . . . permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participat-

ing or interested in such dispute (as these terms are hereinafter defined) from doing, whether singly or in concert, any of the following acts:

> "(b) Becoming or remaining a member of any labor organization . . . . .
>
> "(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute . . . ."

On its face, § 4 precludes issuance of the injunction granted below. The exception for emergencies provided in § 7 of the Act, 29 U.S.C. § 107 (1970), is inapplicable. Nor can the company invoke the exception created by *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), because there was no *strike* over an arbitrable grievance. *Cf. Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

 The employer argues, however, that this case does not present a "labor dispute" within the meaning of Section 13(c) of the Norris-La Guardia Act, 29 U.S.C. § 113(c) (1970). We disagree. For "labor dispute" in the context of the Norris-La Guardia Act is broadly defined. *See Bowater S.S. Co. v. Patterson*, 303 F.2d 369 (2d Cir.), *cert. denied*, 371 U.S. 860, 83 S.Ct. 116, 9 L.Ed.2d 98 (1962). Section 13(c) of the Norris-La Guardia Act, 29 U.S.C. § 113(c) (1970), defines a "labor dispute" to include

> "*any controversy* concerning terms or conditions of employment, or *concerning the association* or representation *of persons in* negotiating, fixing, maintaining, changing, or *seeking to arrange terms or conditions of employment*, regardless of whether or not the disputants stand in

---

**2.** Judge Werker also ordered the union to "abide by the determination of the NLRB declaring the customer service employees to be managerial employees." The injunction is broad enough to prevent organization of the customer service employees as part of the union's present bargaining unit or in a separate unit.

**3.** The District Court did not have jurisdiction to issue the injunction by virtue of Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), because the

action was not brought by the Regional Director of the Board, but only by the private employer. *Cf. International Bhd. of Teamsters v. International Union of Brewery Workers*, 106 F.2d 871 (9th Cir. 1939) (*no* federal court jurisdiction over recognitional disputes prior to enactment of § 10(*l*); *Cupples Co. v. American Fed'n of Labor*, 20 F.Supp. 894 (E.D.Mo.1937) (same). Nor has there as yet been any picketing.

the proximate relation of employer and employee."

(Emphasis added.) [4] In the case at bar, there can be no doubt that there was a controversy "concerning the association or representation" of the customer service men for the purpose of collective bargaining over the terms and conditions of employment.

That "labor dispute" has a broad meaning under the Norris-La Guardia Act is illustrated by *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), in which picketing against racial employment discrimination was held to be a "labor dispute"; and by *Milk Wagon Drivers' Local 753 v. Lake Valley Farm Prods., Inc.*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), which held that a dispute affecting working conditions in the industry, whether applicable to workers described as "vendors" or as "employees" was a "labor dispute." *See Aetna Freight Lines v. Clayton*, 228 F.2d 384, 387 (2d Cir. 1955), *cert. denied*, 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474 (1956). Similarly, informational picketing against foreign ships has been held to involve a "labor dispute." *Port of Houston Authority v. Int'l Org. of Masters, Mates & Pilots*, 456 F.2d 50 (5th Cir.), *cert. denied*, 409 U.S. 894, 93 S.Ct. 113, 34 L.Ed.2d 151 (1972). And suits involving independent contractors may come within the definition of "labor dispute," *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), if terms and conditions of employment are affected. We believe that there is no controlling authority which equates ineligibility for protection under NLRA with amenability to the injunction process as prohibited by the Norris-La Guardia Act.

Finally, we must reject the argument that the injunction was properly issued because the Norris-La Guardia Act only precludes injunctions against *legitimate* union activities. *Cf. United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). For, assuming *arguendo* that this is a correct statement of the law, we cannot characterize Local 6's activities as illegitimate. The union has not engaged in a strike, in picketing, or in any form of economic coercion which would be actionable under traditional equitable principles. The union thus far is attempting only to organize the customer service employees to become union members. Contrary to the company's contentions, the act of organizing managerial employees is not itself illegal. Before the Wagner Act came into being, there was a right of association; and, of course, labor unions already had collective bargaining agreements with employers. We do not believe that the labor act's exclusion of managerial employees from its coverage was intended to divest them of that pre-existing right of association. Although the status of *supervisors*, who concededly may organize notwithstanding their exclusion from the Act, *see, e. g., Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 661, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974), *quoting* H.R.Rep.No.245, 80th Cong., 1st Sess. 17 (1947); *accord*, S.Rep.No.105, 80th Cong., 1st Sess. 28 (1947); 93 Cong.Rec. 3952 (1947) (remarks of Senator Taft), is affected by Section 14(a), which provides that "Nothing herein shall prohibit any . . . supervisor from becoming . . . a member of a labor organization," we do not think that this is a crucial difference. We are unwilling to infer from the failure to include in Section 14(a) any reference to managerial employees—who are exempted from the Act only by implication—any congressional intent to strip them of rights retained by supervisors, who are expressly exempted. We are especially loathe to impute such an intent to Congress when the rights involved approach constitutional proportions. *See N.L.R.B. v. Edward G. Budd Mfg. Co.*, 169 F.2d 571, 577 (6th Cir. 1948), *cert. denied*, 335 U.S. 908, 69 S.Ct. 411, 93

---

4. 29 U.S.C. §§ 113(a) and (b) give definitions to "a case involving or growing out of a labor dispute" and to "persons participating or interested in a labor dispute," which are also broad enough to encompass the case on appeal.

L.Ed. 441 (1949), *citing N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 34, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

Certainly there is nothing in the Supreme Court's opinion in *N.L.R.B. v. Bell Aerospace Co., Div. of Textron, Inc.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), which suggests such a distinction. On the contrary, the Court in *Bell Aerospace* actually drew analogies for managers to the case law concerning supervisors, as well as to the legislative history of Section 14(a). The Court held only "that it was Congress' intent that [managerial] employees not be accorded bargaining rights *under the Act*," 416 U.S. at 288, 94 S.Ct. at 1768. (emphasis added). This is not different from the statutory status of supervisors. *Cf. ILGWU v. NLRB*, 339 F.2d 116, 121 (2d Cir. 1964) (Marshall, J.).

■ Corporate Printing strenuously urges, however, that as a practical matter its rights to insist on the loyalty of its managers and to refuse to bargain with them collectively will be rendered nugatory if it cannot enjoin the union's organizational activities. We cannot agree. It has alternative remedies, none of which raise the problems raised by an injunction. As a matter of statutory law, Corporate Printing can refuse, without fear of sanctions, to engage in collective bargaining with the customer service men. *Cf. Florida Power & Light Co. v. IBEW Local 641*, 417 U.S. 790, 808–09, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974); *Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 659, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974); *A.H. Bull S.S. Co. v. National Marine Engineers' Beneficial Ass'n*, 250 F.2d 332, 338 (2d Cir. 1957). It can discharge them for engaging in union activities, *see Florida Power & Light Co., supra; A.H. Bull S.S. Co., supra*, at 339, and replace them with nonunion members, *Florida Power & Light Co., supra*. Thus, an employer may refuse to bargain with those ineligible for certification. He may even discharge them with impunity. But he may not enjoin them from exercising their right to organize in the fashion available to them before the passage of the Labor Acts.

The foregoing analysis would end the case were it not for the union claim that it has a right, *dehors* the Labor Act, to hold the employer to its alleged agreement to recognize as a bargaining unit the three customer service men. The union states that it is not necessary to seek NLRB certification, in light of the alleged consent by the employer in Section 111 of the Agreement. It argues, moreover, that if there is doubt as to whether the employer consented to recognize the customer service employees as a bargaining unit under the Agreement, that is a matter for decision by the Arbitrator named in the Agreement.

The threat of the union to let an arbitrator decide that issue has, obviously, frightened the employer. For if an arbitrator could properly, within his discretion, compel the employer to bargain with such a unit as a matter of contract, the employer might be without effective legal recourse. It is this consideration which presumably led Judge Werker to enjoin the union from further steps before it became too late as a practical matter.

The employer may argue that, as Judge Werker indicated, an interpretation which included within the scope of Section 111 a possible right to represent a unit of employees whom the National Labor Relations Board treats as managers would, in the light of *Bell Aerospace, supra*, be beyond the jurisdiction of the arbitrator in the absence of an express consent.

As we have seen, however, jurisdiction to enjoin a labor dispute cannot be conferred by such considerations. We do not decide whether a claim to recognition rights for managers under Section 111 may be deemed so far afield that it is not even an arbitrable dispute, and or whether an arbitral award directing recognition of a managerial unit based on Section 111 would be vacated on appeal to the federal courts, as not "drawing its essence" from the collective bargaining agreement. *See United Steel Workers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The only issue before us is the propriety of enjoining the organization at the outset. This, as we have seen, is improper.

Reversed with directions to vacate the injunction.